(C. D. 1100)

F. W. MYERS & Co., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided April 2, 1948)

Barnes, Richardson & Colburn (*Eugene F. Blauvelt* of counsel) for the plaintiff.
Paul P. Rao, Assistant Attorney General (*William J. Vitale* and *Richard F. Weeks*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Different kinds of merchandise, presenting two separate and distinct issues, are involved in these cases, i. e., protests 132174–K and 132175–K, which will be referred to in this opinion as case No. 1 and case No. 2, respectively.

Case No. 1 concerns so-called lacquer reducer described in the Government analyst's report, illustrative exhibit F, as "a mixture of 64% ethyl acetate and 36% amyl alcohol by weight." It was classified under paragraph 24 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 24) as a mixture of chemical compounds containing more than 20 per centum of alcohol but not in excess of 50 per centum, and was accordingly assessed with duty at 40 cents per pound and 25 per centum ad valorem. Plaintiff's claim and the issue presented thereunder are stated by counsel in their brief as follows: "It is here contended by the plaintiff that the lacquer reducer did not contain any alcohol and, therefore, is dutiable as shown by its analysis, Illustrative Exhibit B, as a mixture of chemical compounds, not specially provided for, at 25% ad val. under Paragraph 5 of the Tariff Act."

Illustrative exhibit B, referred to as an analysis, is in reality a report introduced as part of plaintiff's case. It was identified as the "production slip" used by the Canadian manufacturer in producing the lacquer reducer, or thinner, in question and as being in conformity with the original formula. Said analysis or report shows the product to contain three chemical compounds, physically mixed.

Frank L. Steele, chief chemist of the Glidden Company, Canadian manufacturer and exporter of the merchandise under consideration, appeared on behalf of plaintiff. He testified that he has been associated with said company for approximately 15 years doing research work on varnishes and lacquers, and that he developed the formulas for all of the products in question. The nature of the ingredients in the lacquer reducer was explained by the witness in this manner: Ethyl acetate, amounting to 48.2 per centum of the product, and butyl acetate of which there is 21.1 per centum, are esters, the former being the combination of ethyl alcohol and acetic acid, and the latter created by combining butyl alcohol and acetic acid, with the alcohol losing its identity as such in the resulting compounds. The "petroleum naphtha" is in fact a commercial product of the American Mineral Products Company, purchased by the Canadian manufacturer of the lacquer reducer, under the trade name "Lacto Spirits." The witness described it as "a light petroleum fraction, similar to gasoline," and also characterized it as *a spirit of naphtha and alcohol and is sometimes described as a spirit wash.*" [Italics added.] He was questioned concerning the presence of amyl alcohol and stated there was none, and "furthermore we don't use amyl alcohol in the plant. We don't have any in the plant and haven't had any for a great many years."

Plaintiff's testimony, relating to the use of amyl alcohol, becomes especially important in the light of the Government analyst's report, illustrative exhibit F, *supra*, presented as part of defendant's case and showing the lacquer reducer to contain "36% amyl alcohol by

weight." Charles E. Augner, chemist employed in the United States Customs Service in New York, and who prepared the report, illustrative exhibit F, testified on behalf of defendant. He is peculiarly well-equipped to deal with merchandise like that here involved because while employed with the Government during the war he "did considerable work for the Maritime Commission and ran through laboratory tests on all types of paints and varnishes and the like, to see that they conformed to Federal specifications." This witness was most emphatic in his testimony to the effect that his determination of hydroxy value revealed very definitely an alcoholic content.

Whether it is amyl alcohol, or one of its isomeric forms, is immaterial. The provisions of paragraph 24, *supra*, contemplate chemical compounds or mixtures thereof containing alcohol, without regard to any particular kind or type of alcohol. It is of interest to observe that paragraph 4 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 4), although it is not related to the present issue, provides for "alcohol," the generic term, and then lists different kinds of alcohol in this manner: "Alcohol: Amyl, butyl, hexyl, and propyl, all the foregoing whether primary, secondary, or tertiary." This is mentioned to suggest that if Congress intended to limit the chemical compounds and mixtures provided for in paragraph 30, *supra*, to those containing alcohol of some particular kind or grade, they would have said so as they did in paragraph 4.

The contradiction between the parties' testimony, if there is any real contradiction, can be resolved by further consideration of the presence of the "Lacto Spirits." The ingredient is concededly a product obtained from a source outside the plant where the imported lacquer reducer is manufactured. Consequently, the Canadian exporter has no control over the production of what it terms "petroleum naphtha," used in its products. Such circumstances, coupled with plaintiff's admission that alcohol is contained in "Lacto Spirits," serve to support the Government analyst's conclusion, showing an alcoholic content of the imported merchandise.

On the record before us, plaintiff has failed to establish for the lacquer reducer a classification different from that found by the collector.

We now dispose of case No. 2. The merchandise involved therein is described on the invoice as "Lacquer Sealer" and "Lacquer," the latter embracing two items, identified as "flat lacquer" and "clear lacquer." The three products were assessed with duty at 30 cents per pound under paragraph 30 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 30), which provides for "Collodion and other liquid solutions of pyroxylin, of other cellulose esters or ethers, or of cellulose, 30 cents per pound." They are claimed to be dutiable at 15 per centum ad valorem under the provision in paragraph 75 of the Tariff Act of 1930,

as amended by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, for "Varnishes, including so-called gold size or japan, not specially provided for."

The manufacturing sheets, itemizing the ingredients with their proportionate percentages in each of the products and recognized by plaintiff's witness as following his original formula and as having been used in the production of the present merchandise, are in evidence; illustrative exhibit C for the clear lacquer, illustrative exhibit D for the flat lacquer, and illustrative exhibit E for the lacquer sealer. Each ingredient and its function in the clear lacquer, as described by plaintiff, are as follows:

| Ingredient | Function |
| --- | --- |
| Ester gum | Film former |
| Nitrocellulose (gun cotton) | Film former |
| Castor oil | Film former and plasticizer |
| Dibutyl phthalate | Film former and plasticizer |
| Toluene | Diluent |
| Ethyl acetate | Solvent |
| Butyl acetate | Solvent |
| Ethyl alcohol | Ingredient of gun cotton |
| Petroleum naphtha (Lacto Spirit) | Diluent |
| Secondary butyl alcohol | Solvent |

In the case of the flat lacquer, the components are substantially the same as those just enumerated, with the addition of zinc stearate, which is a soapy material, making the lacquer flat. The lacquer sealer contains the same ingredients, but the zinc stearate is included therein to give the material a "sanding effect."

The Government analyst's report, illustrative exhibit F, *supra*, states that the "lacquer" is "a solution of cellulose nitrate compound (pyroxylin) in ethyl acetate and amyl alcohol," and in the course of his oral testimony, the analyst stated in effect that the same description would apply to all three products.

While plaintiff's witness testified, in response to direct questions, that all of the products could be described as a varnish, which he defined as "a very general term which to me indicates any form of clear coating material" (R. 12), on cross-examination he identified each as pyroxylin lacquer, in the following line of testimony (R. 16):

X Q. * * * Do you know of any such thing as pyroxylin lacquer?—A. Yes, sir.

X Q. What is it, please?—A. I would describe pyroxylin lacquer as any lacquer, any varnish-type of material, which contains pyroxylin and by pyroxylin I mean a form of nitrocellulose [one of the ingredients in the three products in question].

X Q. Would that be dissolved in something?—A. It is dissolved in suitable solvents.

X Q. Looking at Illustrative Exhibit C, which is the formula for clear lacquer, that contains nitrocellulose?—A. Yes, 9.3 per cent.

X Q. It also contains solvents, does it not?—A. Yes.

X Q. Please look at Illustrative Exhibit D. That contains nitrocellulose?—A. Yes.

X Q. And also solvents?—A. Yes.

X Q. And also Illustrative Exhibit E, that also contains nitrocellulose?—A. Yes, right.

Plaintiff's identification of the merchandise as pyroxylin lacquer agrees with defendant's characterization.

Counsel for plaintiff, in their brief, make the broad assertion that "the provision for varnishes not specially provided for is a provision by use." No authority is cited to support such a theory nor have we been able to find any. On the contrary, the definition of "varnish," quoted by plaintiff, supports the proposition that the statutory term "Varnishes" is an *eo nomine* designation, clear and unambiguous, and without any suggestion that the element of "use" shall have any influence in classifying merchandise thereunder. Plaintiff's contention is without merit.

Although plaintiff's testimony shows a marked degree of similarity between varnishes and pyroxylin lacquers as film-forming solutions serving to protect the surface to which applied, it is equally clear from the witness' statements that these two surface-coating materials are distinguishable.

The distinction, for tariff purposes, becomes easily discernible from the "SUMMARY OF TARIFF INFORMATION, 1929," compiled by the United States Tariff Commission for use of the Committee on Ways and Means in its consideration of adjustments in the Tariff Act of 1922, where, under the general heading "VARNISHES" (p. 351), the following pertinent information is found:

*Description and uses.*—Varnish is a homogeneous liquid which, when applied to a surface, dries by evaporation of the volatile solvent or by evaporation of the solvent and oxidation of the oil and resins to a more or less impervious elastic film. * * *

Varnishes may be divided into three classes: (1) Spirit varnishes, which are a solution of a gum resin, for example, shellac in a volatile solvent, such as grain or wood alcohol or a mixture of the two; (2) oil varnishes, which contain a gum resin, a drying oil (linseed, China wood), a thinner, and a drier; (3) *pyroxylin lacquers which consist of cellulose nitrate dissolved in a solvent are dutiable under paragraph 30.* [Italics ours.]

In the same volume (p. 153), referring to paragraph 30 of the Tariff Act of 1922, comparable paragraph of the Tariff Act of 1930 under which the instant merchandise was classified, the following reference to pyroxylin lacquers is found under the heading "CELLULOSE ESTERS AND SOLUTIONS OF PYROXYLIN":

* * * The large scale production of satisfactory solvents, other than alcohol and ether, for dissolving pyroxylin and various cellulose esters has greatly facilitated the development of lacquers derived from cellulose.

Production of these lacquers has increased rapidly in recent years. Nearly every American automobile manufacturer uses nitrocellulose lacquers for finishing

cars. There is also an extensive use of these lacquers for furniture and interior house painting. For automobiles the lacquer is applied by the spray method, and for furniture either by spray or brush.

The record herein, considered in conjunction with the official data as hereinabove set forth, fully supports the collector's classification under paragraph 30, *supra*, of the lacquer and lacquer sealer in question.

The protests are overruled and judgment will be rendered accordingly.